Talbot *v.* Provine.

## MARY H. TALBOT *v.* JAMES M. PROVINE.

1. CHANCERY PRACTICE. *Leasehold estates. Minors.* During the minority of infants the Chancery Court has jurisdiction to authorize or confirm leasehold contracts for the protection and preservation and for the enhancement of the real estate of such infants, when it is made manifestly to appear that contracts for either of these purposes is for the interest of the minors.

Case cited: Thompson *v.* Mebane, 4 Heis., 377.

2. SAME. *Bill of review and original bill. To set aside decree.* The court cannot look to the proof in a cause upon bill of review to set aside a decree, much less upon an original bill seeking to set aside such a decree for errors which do not reach to the question of jurisdiction.

3. SAME. *Fraud. Decree attacked for. Entire proceedings open to examination.* Where a decree is attacked for fraud, the entire proceedings in the original causes are open to examination, not to determine whether there was error in the decree, but to determine whether the decree was procured by undue means.

4. SAME. *Guardians. Powers of.* The act of 1762 does not limit or control the jurisdiction of the Chancery Court, but was designed to operate alone upon and to limit the powers of guardians.

5. SAME. *Trustees. Agents. Power of to contract with beneficiary.* Generally trustees and agents are incapable of purchasing the trust property, etc., except where it appears that the transaction was entirely free from fraud, etc. Facts that will not support such a contract.

Case cited: Coffee *v.* Ruffin, 4 Col., 514.

---

### FROM SHELBY.

---

Appeal from the Chancery Court. W. H. SMITH, Chancellor.

JACKSON & McDOWELL and MARTIN for complainant.

HUMES & POSTON for defendant.

NICHOLSON, C. J., delivered the opinion of the court.

On the 1st of January, 1857, Martha P. Talbot, as guardian for Mary H. Talbot, entered into a written contract with J. M. Provine and E. P. Stewart, whereby she leased to said Provine and Stewart two lots in Memphis for a term of eleven yrears from that date. In consideration of the use of said lots, Provine and Stewart agreed to pay the said guardian $87.25 (ground rent) per annum, payable the 1st of January each year, and provine and Stewart agree to pay all taxes and charges that might be levied on the lots, during the term, by the State, county or corporation. It was agreed that, at the expiration of the lease, the buildings and the improvements upon each lot should be valued by two competent and disinterested men, and the valuation thereof at that time to be allowed to Provine and Stewart, and upon the payment of the amount, Provine and Stewart were to deliver possession of the lots and improvements; but if the valuation should not be paid, a lien was retained on the improvements for the valuation.

There is no obligation imposed by this contract upon Provine and Stewart to place any improvements on the lots, and, accordingly, none were placed there until after June, 1857.

On the 12th of June, 1857, Martha P. Talbot and her three daughters, Mary H., Delia and Ruth, together with J. M. Provine and E. P. Stewart, filed their bill in the Common Law and Chancery Court at Memphis, for the purpose of procuring a confirma-

tion by the Chancellor of the contract already referred to, and others of similar character made on behalf of the other two daughters. They state that the three daughters, all minors, owned in fee a large real estate within and near to Memphis, consisting mainly of unimproved lots in Memphis, which are subject annually to heavy taxes and other charges, which they have not the ability to pay, as their vacant lots yield no revenue, and their other means are inadequate to their payment, and that hence to save this property from sale for taxes, some of the lots have already been sold, and it will require others to be sold hereafter, by which means their estate will be exhausted.

They state that they are advised that this guardian has no power to contract for putting buildings and improvements on their lots, and no means of her wards' with which to pay for them.

They then set out the several contracts made with Provine and Stewart already referred to, which contracts, they state, were made subject to the sanction of the court. They state that these leases are the best arrangements that can be made for the improvement and preservation of the estate of the minors, and if executed, that they will be manifestly advantageous to them, but that unless these leases are approved and made valid and binding upon the minors and their estates, so that said Provine and Stewart shall in some way, at the proper time, get compensation for their outlays and improvements, they will forbear to carry out the contracts, or to make valuable improvements thereon; but if the contracts are approved

Talbot *v.* Provine.

and made binding, so that Provine and Stewart may get compensation for their improvements and other expenditures, they will, during the year, erect valuable business houses, permanently enhancing the value of the lots. They pray that the court will sanction said contracts, each of which expire about the periods of the majority of the minors, and will make a decree binding said minors and their estates to make Provine and Stewart compensation for said buildings and improvements as the minors respectively come of age.

The matters stated in the petition were immediately referred to the clerk and master for a report. Proof was taken and a report made to the effect that the contracts were for the manifest advantage of the minors. The report was confirmed, and a decree rendered approving the contracts and authorizing the same to be executed by the erection of buildings and improvements on the lots in pursuance of the stipulations in the leases. All these proceedings took place at the first term, and were consummated within a few days after the filing of the bill.

Under this decree Provine and Stewart proceeded during the summer and fall of 1857, to erect large business houses on the lots. After the buildings were erected and the improvements made, Provine and Stewart becoming doubtful as to the validity of the decree under which they had acted, filed their bill on the 13th of May, 1858, against Martha P. Talbot, guardian, and her wards Mary H., Delia and Ruth Talbot, in which similar allegations are made to those

in the first petition, and asking for the same relief. This bill was answered by Mary H., Delia and Ruth Talbot, by their guardian Martha P. Talbot, submitting the rights and interests of her wards to the protection of the court.

The matters alleged in the bill were referred to the clerk and master, proof was taken—it being the same taken in the former case with some addition,— a report made that the leases were manifestly advantageous to the minors, and a decree thereon approving and ratifying the leases as in the former decree.

On the 11th of January, 1868, Mary H. Talbot filed her original bill in the nature of a bill of review in the Chancery Court at Memphis, against J. M. Provine, E. P. Stewart being dead, alleging that Provine is in possession of the lots and the improvements thereon, made under the leases before referred to, and claiming to retain possession until the valuation shall be made, and the amount paid in pursuance of one of the stipulations in the leases. She alleges that J. M. Provine, at the time of procuring said leases, was the agent of Martha P. Talbot, her guardian, for the management of said property and of other property of the estate of Jas. H. Talbot. She further alleges that at the time said lease was made she was a minor, and that said lease was made to run until December 31, 1867; that she became of age the 13th of January, 1867. She further alleges that in the proceedings for the confirmation of the leases, she was not represented by guardian *ad litem.* She states that by the proof in the said cause, the buildings cost

$8,000 each, and that now they would not be valued at more than the land on which they are built is worth, or would sell for. She charges that her guardian had no right to so charge her property, and more especially beyond her majority, and that the Chancery Court had not the power so to charge and bind her real estate, and that Provine has been more than compensated for all expenses that may have been incurred in building and paying charges on said property. She prays that the decree in the cause referred to may be reviewed, set aside and vacated, and said lease declared void since her majority, and that possession be decreed to her.

The bill was answered by Provine, who admits the making of the contract for the lease, and that he obtained the confirmation thereof by decree of the court as alleged. He neither admits nor denies that complainant attained her majority on the 13th of January, 1867, and if this was a mistake, he says it was wholly due to the mother and guardian of complainant, but he insists that the lease is binding for the full term stipulated. He insists that complainant was represented in the said suit by her mother, who acted as guardian *ad litem,* and that the court accepted her as such. He denies that the buildings are now worth more than the lots; he says the lots are worth $22,-000 each, and the buildings would now cost about $10,000 to build them, and that they were originally built at a cost of $8,000 each. He denies that he has been re-imbursed more or as much as his expenditures from the rents of the buildings.

He insists and argues that the arrangement for the improvement of the lots was advantageous to complainants.

In an amended answer he admits, that the guardian had employed him to lease out the vacant lots, and that he failed to obtain any contracts. He says that his connection with the leasing of these lots was entirely severed at the time of his taking the leases, and that they were made to him through her attorney Gov. I. G. Harris; that the leases were made in the fullest and fairest good faith.

After the taking of proof on both sides, the cause was heard on the 14th of May, 1869, when the Chancellor held that the contract of lease as approved and confirmed by decree of the court, in the case of Provine and Stewart *v.* Martha P. Talbot and others, was valid and binding up to the 31st of January, 1867, when complainant reached her majority, but void after that time, the same having embraced the period beyond her majority by mutual mistake of the parties. He decreed that Provine was entitled to payment for the improvements erected on the lots, and complainant and defendant were allowed thirty days within which to have the amount ascertained by valuation of two competent men, and if that was not done, the clerk and master was ordered to take proof and report the value of the buildings on the 13th of January, 1867. The clerk and master was ordered not to take the isolated value of such buildings and improvements, or what amount it might cost to erect the same at the date of valuation, but to ascertain and report how much

Talbot *v.* Provine.

such buildings and improvements permanently enhanced the value of the real estate, and this enhancement is to be reported as the value of the buildings and improvements. In ascertaining the enhanced value of the lots by reason of the improvements, the master was directed to ascertain the value of the ground with the improvemets and without,˙ the difference would be the permanent enhanced value.

The report was made, and after exceptions on both sides, the Chancellor decreed that there was a balance due Provine from Mary H. of $13,365, and from Delia W. $10,921, and if the same was not paid within thirty days, the improvements to be sold on a credit of six months, and free from the equity of redemption.

From this decree all the parties appealed.

And third, that as Provine was the agent of complainant when the leases were made and confirmed, the decrees were procured by a fraudulent concealment from the court of the fact of such agency.

It is laid down in sec. 427 of Story's Eq. Pl., that "where an improper decree has been made against an infant, although the same was not gained by fraud or collusion or surprise, it ought to be impeached by original bill." The bill is therefore maintainable on either of the grounds stated, if the allegations thereof are sustained by the proof.

It is insisted for complainants that the Chancery Court had no jurisdiction, inherent or statutory, to make decrees by which the real estate of minors could be leased upon the terms contained in these leases.

This question has been argued on both sides with learning and ability, but we do not deem it necessary to investigate the question again, for the reason that in the case of *Thompson* v. *Mebane,* 4 Heis., 377, the authorities were fully examined by this court, and a conclusion arrived at with which we are satisfied. In that case the court say: "We have no hesitation in declaring that a court of chancery had general juris-diction, aside from the acts of 1827 and 1829, over the estates as well as the persons of infants, and could, under appropiate circumstances, and for proper purposes, direct the sale of their real property.". We are there-fore of opinion that during the minority of infants the Chancery Court has jurisdiction to authorize or confirm leasehold contracts for the protection and pres-ervation and for the enhancement of the real estate of such infants, when it is made manifestly to appear that contracts for either of these purposes is for the interest of the minors. Whether such contracts could be authorized or confirmed producing incumbrances on the estates of minors, after their maturity, we are not now called on to decide. Nor do we think that the act of 1762 has the effect, or was intended to limit or control the jurisdiction of the Chancery Court, but was designed to operate alone upon and to limit the powers of guardians.

We are therefore of opinion that the Chancery Court had jurisdiction to authorize or to confirm the leases referred to in the pleadings, and that these were valid and binding on the parties until the maturity of the minors, unless it shall appear that the decrees

authorizing or confirming these leases are void for other reasons.

It is next insisted that there are irregularities and defects in the proceedings which preceded the decrees, for which those decrees can now be re-examined and set aside.

The decree rendered in the case of Provine and Stewart against Martha P. Talbot, guardian, etc., contains all the articles necessary to give the court jurisdiction, and if there is any error on the face of the decree, it is such error only as can be ascertained by reference to the proof made in the cause and other irregularities in the proceedings, to which we are not authorized to look upon a bill of review, much less upon an original bill seeking to set aside such a decree for errors which do not reach to the question of jurisdiction.

But it is insisted in the next place that the decree ought to be set aside for fraud in its procurement. This is a legitimate ground on which the decree may be attacked, and in the investigation of this question the entire proceedings in the original causes are open to examination, not to determine whether there was error in the decree, but to determine whether the decree was procured by undue means.

The allegation is, that Provine, one of the lessees, had been, prior to the date of the leases, and down to that time, the agent of Martha P. Talbot, the regular guardian of complainants, and that he took advantage of his fiduciary relation, and in that way procured from the guardian leases of the real estate of

her wards which were highly beneficial to himself and
greatly disadvantageous to the minors; and that after
thus procuring contracts of lease from the guardian,
that he procured these contracts to be ratified and
confirmed by the Chancery Court without disclosing to
the court the fact of his fiduciary relation to the par-
ties, and without showing to the court by clear and
satisfactory proof, that the contracts were, in all re-
spects, fair and entirely free from all imputatation of
fraud or unfair advantage. This allegation is denied
by Provine, and he states that although he had been
the agent of complainants as alleged, yet that at the
time these contracts were made his agency had ceased,
and that the contracts were made with the guardian
of complainants, through her solicitor, who advised the
making of the leases as advantageous to complainants.

This statement as to the agency of the guardian's
solicitor in advising the making of the leases, is sub-
stantially sustained by the deposition of the solicitor.

The powers of a trustee or agent to contract with
the *cestui qui trust* in relation to the trust property
were elaborately examined, and many of the authorities
reviewed by this court in the case of *Coffee* v. *Ruffin*,
4 Col., 514, when the following was laid down as the
result: "So, we think, it may now be regarded as
the settled doctrine of the courts of chancery in Ten-
nessee, that, as a general proposition, trustees, unless
they are only nominally such, agents, or any persons,
who, by this connection with any other person, or by
being employed or concerned in his affairs, have
acquired a knowledge of his property, are incapable

themselves of purchasing the trust property, or the property over which they may have control as trustees or agents, or in right of any fiduciary or confidential relations whatever, from the *cestui qui trusts*, or beneficiary, or principal.    But if the party seeking to maintain such transactions can show by clear and satisfactory proof that the same was, in all respects, fair and entirely free from all imputation of fraud or unfair advantage; that there was no concealment and no advantage taken by the trustee, or such person standing in such fiduciary or confidential relation, of information or knowledge acquired by him as such, and that there was no inadequacy of consideration, a court of equity will not interpose to set it aside.    The fact that the relation may have terminated before the date of the transaction cannot affect or change the rule, but it is a fact to be taken into consideration in the investigation of the question touching the alleged fairness of the transaction, and may be entitled to much or little weight, depending upon the particular circumstances of the case."

Tested by the rules here laid down, was the conduct of Provine such, in making the contracts of lease with the guardian, and in procuring their confirmation by the Chancellor, as to entitle him to their benefits by a specific execution?    We think it clear that he had the management and control of the property as agent · down to the time that he became one of the lessees thereof.    The guardian was the mother of her wards, and the fact that she procured Provine to represent her as agent shows that she was unwilling or

33—VOL. 7.

unable to execute the trust herself, and that she had confidence in his capacity and his fidelity. With such relation as this subsisting between the parties, the fact that she consented to make the contracts and believed them beneficial to her wards, has but little weight in it.

The leases were to terminate about a year after the coming of age of the wards. This may have been the result of a mistake as to their ages, but surely it was a singular mistake to be made by a mother.

The leases were dated January 1, 1857, and were to run eleven years. They were executed contracts on their faces, not dependent on a confirmation by the Chancery Court. They were to take effect immediately by their terms. This of course terminated Provine's agency, and took the lots out of market for leasing purposes.

The terms and stipulations of the leases are remarkable. Provine and Stewart are not expressly bound to put any improvements on the lots, but if they do, they can exercise their own discretion as to their character. But whatever might be the improvements, at the expiration of the leases the improvements were to be valued, and the valuation to be allowed to the lessees, and for the payment of the valuation a lien was retained on the improvements.

No steps were taken to improve the lots until after the proceeding in the Chancery Court in June, 1857, ratifying the contracts. Of course the lots were effectually withdrawn from the leasing market by the contract, although the lessees were unwilling to pro-

Talbot *v.* Provine.

ceed under them until they had procured the approval of the Chancery Court.

It is clear that the contracts were invalid until ratified by the Chancery Court. Provine and Stewart and the guardian applied to the court for their ratification.

The question is, did they do all that was required of them to show to the court that the contracts were free from all fraud or imputation of unfairness?

Two applications were made to the court for ratifications of the leases, but in neither was the fact disclosed to the Chancellor that Provine had been the agent of the complainants in the management of the property. As far as the record shows the fiduciary relation between Provine and the guardian of complainants was concealed from the court; at least it was unknown. A knowledge of this fact would necessarily have excited the Chancellor to a strict scrutiny into the transaction.

It was the duty of the guardian and the agent to disclose this fact.

But do the proceedings in the two causes for ratification show that everything was done to bring all the facts before the court, and to show that the contracts were for the best interests of the minors? In the second case the guardian and her wards were made defendants, and the minors were represented by their guardian who had made the contracts which were sought to be ratified. No guardian *ad litem* was appointed to defend for the minors.

The testimony taken in the two cases was the same,

except there was one additional witness in the second case. The testimony consisted mainly of the speculative opinions of the witness as to the advantages of the contracts. None of the witnesses but one was cross-examined. This witness states on cross-examination, that the property was then being rented out for about ten per cent. on the value of the land and the improvements; that the cost of the buildings was each $8,000, except two at $7,000, and that the ground was worth about as much as the buildings. These fact which rendered it probable that the lessees, by the expiration of the leases, would receive in rents more than enough to re-imburse them for all their outlays, with interest, taxes and other incidental charges, seem to have attracted no notice. They ought at least to have suggested the importance of showing by proof that the contracts made were the best that could have been obtained, upon proper exertions, for the interest of the minors.

No such proof was made, but it is manifest that the proceedings were little less than formal *ex parte* proceedings in which no real defense was made for the minors, and in which everything was controlled by Provine, whose interest it was to have the contracts confirmed and made binding on the minors.

The law tolerates no such negligence and omission of duty on the part of trustees or agents, but visits them with all the consequences of fraud.

We are satisfied from the proof made in the present case, that if the lots had not been withdrawn from the market by the contracts made by the guar-

Talbot *v.* Provine.

·dian with Provine and Stewart, and if proper efforts had been made by Provine, as agent, to procure contracts for leases, the same could have been effected upon terms far more advantageous to complainants than ·those made on his own behalf.

It follows, from the view we take of the facts, ·that the contracts made between the guardian of complainants and Provine and Stewart were not such as she was authorized as guardian to make, and that although the Chancery Court had jurisdiction to authorize or to ratify proper contracts of lease, yet, in view of the relation subsisting between Provine and complain-·ants, he has failed to show that his conduct in procuring the confirmation of the leases by decrees of the ·Chancery Court, was free from all fraud or from all ·unfair advantages.

The contracts and the decrees confirming them must therefore be set aside, but as Provine and Stewart took possession of the lots not as trespassers, but un-·der contracts apparently valid, no account for rents and profits will be ordered unless they claim for the value of the improvements, in which event they will be held to account for the rents and profits down to the times when the lots were surrendered, and they will be credited for the enhanced value of the lots by reason of the improvements, the value to be ascertained at the times when the lots were surrendered, also with the ground rent and taxes on the lots paid. If desired the cause will be remanded, and if the ·amount of the value of improvements, ground rent ·paid and taxes, shall exceed the amount of the rea-

sonable rents as ascertained, Provine will be entitled. to have the excess paid out of future rents of the property.


On application for re-hearing NICHOLSON, C. J., delivered the following:

The main question made upon the argument of the application for re-hearing is, that the proof does not sustain the conclusion that Provine's conduct in making the leases with the guardian, and in procuring their confirmation by the Chancery Court, fails to show that he acted with entire fairness, and that he took no advantage of his position as agent, but that his action in the premises was not free from all concealment and from all imputation of fraud or undue advantage.

We have again examined the proof on this question, and it shows to our satisfaction that the leases were advantageous to Provine and Stewart, but disadvantageous to the minors; that at the close of the leases Provine and Stewart had probably received in rents an amount sufficient to re-imburse them for their outlays and the ground rent and the taxes, and yet, that according to the contracts as construed by them and by the Chancellor, they were entitled to a decree against Mary for her two lots of over $24,000, and against Delia of over $16,500, with a lien on the improvements for their payment; whereas the proof in this cause shows that if proper efforts had been made to lease the property, it could have been leased for the

Talbot *v.* Provine.

same time and on the same terms, without requiring the minors to pay for the value of the improvements.

We are satisfied by the proof that after Provine made the invalid contract for leases on the 1st of January, 1857, he made no further effort to .lease the lots, and that, upon reasonable effort, leases could have been procured which would not have been so disadvantageous to the minors. Having been the agent down to the time of taking the leases, he was bound, upon his application for ·their confirmation, to disclose his former relation to the property, and then to show clearly and fully that the transaction between him and the guardian was, in all respects, fair and entirely free from all imputation of fraud or unfair advantages.

We come to the conclusion after a thorough examination of the record, that the proof fails to make out such a case, but that it shows that by improper means Provine procured the confirmation of the leases, without disclosing his former relation to the property, and that the leases were disadvantageous to the minors, and upon a review of the proof, we are constrained to adhere to our former conclusion and to disallow the petition for re-hearing.