Calvin C. GREEN, et al., Plaintiffs,

v.

David WILLIAMS, et al., Defendants.

No. CIV–4–78–34.

United States District Court,
E. D. Tennessee,
Winchester Division.

July 6, 1981.

On Motion for Leave to Interrogate Jurors
Aug. 5, 1981.

Order on Attorneys Fees Aug. 17, 1981.

On Attorneys Fees and Costs
Oct. 19, 1981.

On Motion For Judgment NOV
Nov. 17, 1981.

On Striking "Satisfaction of Judgment"
March 17, 1982.

Avon N. Williams, Jr. and Richard H. Dinkins, Nashville, Tenn., for plaintiffs.

Rondal T. Wilson, Fred B. Hunt, Jr., John C. Shofner, Jack M. Irion, and William S. Russell, Shelbyville, Tenn., for defendants.

## MEMORANDA OPINIONS AND ORDERS

NEESE, District Judge.

The right of the plaintiffs to be secure in their persons and effects, as well as in the house of the plaintiffs Mr. Calvin Coolidge Green and his wife Mrs. Eula Green, against unreasonable seizures, Constitution, Fourth Amendment, hereby is DECLARED to have been violated by the non-corporate defendants herein. 28 U.S.C. § 2201. " * * * No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said * * *, 'The right to one's person may be said to be a right of complete immunity: to be let alone.' * * * " *Union Pacific Railway Co. v. Botsford* (1891), 141 U.S. 250, 251, 11 S.Ct. 1000, [1001] 35 L.Ed. 734, 737, cited and quoted from in *Terry v. Ohio* (1968), 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 898–899[2]. "The right of the people to be secure in their * * * houses * * *, against unreasonable * * * seizures, shall not be violated * * *." Constitution, Fourth Amendment, *supra.*

The plaintiffs Mr. and Mrs. Green, citizens of the United States, were driven violently from their home by a heavily-damaging and dangerous barrage of gunfire from several different types of lethal weapons on the heels of having been terrorized, by the scare-tactic of a forewarning that they were being "watched" by the infamous

Ku Klux Klan. The plaintiffs are all black persons, and the individual defendants are all white persons.

The individual defendants are of 2 classifications for the purposes of this consideration: (a) Messrs. Williams, sheriff, and Fann and Boyce, deputies sheriff, are stipulated to have been at the times pertinent hereto officials of Bedford County, Tennessee, acting under color of Tennessee law; and (b) the other individual defendants were engaged jointly with such law-enforcement officials in prohibited activity and, thus, also were deemed acting herein under color of Tennessee law. *United States v. Price* (1966), 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267, 272, n. 7[5]. Accordingly, the deprivation by the defendants of the plaintiffs' right to security was proscribed by 42 U.S.C. § 1983.

▮ The plaintiffs seek further relief from this Court by way of an injunction, prohibiting the individual defendants from again depriving them of their civil rights. This Court is empowered to grant the plaintiffs such equitable relief under the immediately afore-cited statute, *supra*, in redress of such deprivation. 28 U.S.C. § 1343(a)(4). The instant issue is whether " * * * 'there exists some cognizable danger of recurrent violation' * * *." *Rondeau v. Mosinee Paper Corp.* (1975), 422 U.S. 49, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12, 21[4].

There is little danger that the violations of the defendants former Sheriff Williams and his deputies Messrs. Fann and Boyce will recur. All are no longer law-enforcement officers with remaining jurisdiction over the New Town community in the Rockvale section of the county where their violations occurred. As to their codefendants, however, we remain after, nearly 2,500 years under the teaching of Confucius to " * * * [s]tudy the past if you would divine the future." Where defendants against whom a prohibitory injunction is sought are shown, as here, to have settled into a continuing practice and had cojoined to violate a constitutionally-guaranteed right, " * * * courts will not assume that it has been abandoned without clear proof.

* * * It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption. * * * " *United States v. Oregon State Medical Soc.* (1952), 343 U.S. 326, 333, 72 S.Ct. 690, 695–96, 96 L.Ed. 978, 985 (headnote 6).

This is not to imply that any of the defendants, who were long-time neighbors of Mr. and Mrs. Green and former neighbors in his lifetime of their son Mr. Willie Frank Green, have made to date any protestations of repentance and reform; it is their position that they were not responsible in any way for "running-off" Mr. and Mrs. Green from their home. Indeed, the defendant Mr. Francis did not even deign to deny under his oath as a witness their allegations against him; this raises a strong inference that his sworn testimony would not have supported his unsworn denials of culpability. *Culbertson v. The Steamer Belle* (1856), 59 U.S. (18 How.) 584, 15 L.Ed. 493, 495.

Until the white defendant Mr. Francis purchased realty, formerly under the extended ownership of the black Green family, and placed thereon a mobile home for residential purposes, the witnesses are in consistent accord that the New Town community, although integrated racially, was peaceable, orderly and neighborly; no distinction had been drawn on the basis of race for the preceding quarter-century by the white majority or the black minority of its populace in the doing of neighborly deeds and demonstrating care and concern for everyone in the neighborhood. That somewhat Edenic existence was interrupted and erupted into violent retaliation in 1977 when the Francis family and the Green family disagreed as to the location of a boundary between their contiguous properties.

These were not the first adjoining-landowners to convert their virtual Paradise into something of a Purgatory because of their disagreement as to such proper location, nor will they be the last. Emotions

run high in these controversies, and the determination to prevail becomes paramount. The description of such a dispute as " * * * unfortunate * * *," *Ogle v. Trotter*, C.A.Tenn. (1973), 495 S.W.2d 558, 559, is a paragon of understatement. These conditions and feelings exist, regardless of the respective races of which the disputants may be members.

The plaintiff Mr. Willie Frank Green contributed to the tenseness of the situation; a barbed-wire fence was erected along the line for which the Greens were contending, upon a portion of which affected land Mr. Francis had planted a corn-patch. The younger Mr. Green then "bogged" such portion of Mr. Francis' growing corn with a disc-harrow drawn by a tractor, destroying it for crop-purposes, and seemed to dare Mr. Francis to " * * * do something about it. * * * "

At this point in the argument, Mr. Francis had that young Mr. Green arrested and also commenced litigation to establish the true line against the Greens in the Chancery (Equity) Court of Bedford County, Tennessee. It was during the progress of that trial that a sticker of a Ku Klux Klan was posted on the mailbox of Mr. Calvin Coolidge Green, and what had been theretofore a boundary-dispute between neighbors was converted overtly into misconduct with a racially-discriminatory purpose as at least a part of the motivating factor. *See Arlington Heights v. Metro. Housing Corp.* (1977), 429 U.S. 252, 255–256, 97 S.Ct. 555, 558–559, 50 L.Ed.2d 450, 464–465[12].

The individual codefendants of Mr. Francis sided with him in the raging controversy in their neighborhood; they claim this was because they believed him to be "right" in the torrid argument; it could have been predicated on the differences in the races of the contestants. Whatever the inspiration for their preference in the dispute, these neighbors and an intruder into their neighborhood congregated in and about the Francis home. There was also a congregation of black persons, not excluding an 11-year-old youth, in the Green dwelling. In the setting of this hostile "choosing-up of

sides," the shooting commenced and continued spasmodically.

With the firing of 2 shots from the Green home; the publicizing of the past events via television-broadcast; and the tardy but ultimate appearance of a federal and state law-enforcement officers on the scene, the neighboring defendants abandoned their barrage. We are left to contemplate whether the seige of the Green home would have been halted otherwise.

The defendant Mr. Francis, his agents and employees, are under injunction of December 12, 1977 in *David L. Francis, et ux. v. Martha Green Woods, et al.*, no. 9958 in the Chancery Court of Bedford County, Tennessee not to, *inter alia*, harass Mr. Calvin Coolidge Green, his wife Mrs. Eula Green, or their son Mr. Willie Frank Green, or permit anyone to congregate on his (Mr. Francis' property) for the purpose, *inter alia*, of harassing or harming the plaintiffs herein, pending the final hearing therein. So long as that injunction is in effect, there appears no reason to duplicate it in redress of the plaintiffs herein. There is no cognizable danger of recurrent violations by Mr. Francis; it may be assumed that the injunction against him will be obeyed, *Chaffin v. Robinson* (1948), 187 Tenn. 125, 213 S.W.2d 32, 35[8], and if it is not, the state Chancery Court may exert " * * * the power inherent in all courts to enforce obedience * * *," *Myers v. United States* (1924), 264 U.S. 95, 103, 44 S.Ct. 272, 273[1], 68 L.Ed. 577.

Accordingly, the permanent injunction of this Court will ISSUE instanter, that the defendants Messrs. Harold Smith, Thomas Upchurch, Horace T. Garrett, Thomas C. Matthews, and John T. Underwood will not deprive any plaintiff herein of his or her rights, privileges and immunities under the Constitution of the United States or any of its laws; such injunction will bind the aforenamed parties to this lawsuit, any other party hereto, their agents, servants, employees, and attorneys, and also those persons in active concert or participation with them who receive actual notice of this order. Rule 65(d), Federal Rules of Civil Procedure. No security therefor is required of the plaintiffs.

■ The plaintiffs, as the prevailing parties herein, are entitled also to have taxed against all the remaining defendants as a part of the costs their reasonable attorney's fee incident to this (as opposed to any state or other) litigation under the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988. There are no special circumstances herein rendering such an award unjust. " * * * Prevailing plaintiffs in civil rights cases win fee awards 'unless "special circumstances" would render such an award unjust.' * * * " *Roadway Express, Inc. v. Piper* (1980), 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488, 498[6].

The affidavit of such counsel of June 26, 1981 filed with his most recent brief * sets-forth *prima facie* that the plaintiffs' attorney herein spent 13 days in court and 171.9 additional hours outside of court in this representation and the customary fees charged for such services on an hourly-basis. Within 10 days, the remaining individual and corporate defendants will provide the Court with any claim of any reason any such hour(s) should be rejected. *See Northcross v. Board of Ed. of Memphis City Schools*, C.A. 6th (1979), 611 F.2d 624, 636–637[19–21].

The Court must be guided in assessing the amount of a fee for plaintiffs' attorney, as follows:

\* \* \* \* \* \*

* * * In determining what the level of compensation for each category of service should be, the [C]ourt should look to the *fair market value* [emphasis supplied] of the services provided. In most communities, the marketplace has set a value for the services of attorneys and the hourly rate charged by an attorney for his or her services will normally reflect the training, background, experience and skill of the individual attorney. * * *

* * * Focussing on the fair market value of the attorney's services will best fulfill the purposes of the Fee Awards Act, by providing adequate compensation to attract qualified and competent attorneys without any windfall to those who undertake such representation. The entire purpose of the statutes was to ensure that the representation of important national concerns would not depend on the charitable instincts of a few generous attorneys. * * *

*Ibid.*, 611 F.2d at 638[29], [30, 31]. The plaintiffs' reliance on *Newman v. Piggie Park Enterprises, Inc.* (1968), 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263, appears preliminarily to be misplaced: that was an action brought under the Civil Rights Act of 1964, title II, in which, contrary to the matter *sub judice*, the plaintiff could not " * * * recover damages. * * * " *Ibid.*, 390 U.S. at 402, 88 S.Ct. at 966[5].

Because of the fact that all the parties herein are represented by highly-experienced counsel, they are encouraged to take *ex parte* such steps as are deemed advisable to agree among themselves the fair market-value of the services to the plaintiffs herein of their attorney: the fair market-value of the services rendered the defendants by their respective attorneys herein should provide a valuable suggestion of such amount. The Court will await such action for a reasonable time before assigning this matter for whatever additional proceedings appear to be required to conclude it.

### ON MOTION FOR LEAVE TO INTERROGATE JURORS

Suggesting in somewhat vague terms that some outside influence (possibly emanating from one or more of the defendants) might have been brought to bear upon the jury herein, the defendants moved for leave to interrogate the jurors who returned the verdicts herein. *See* this Court's standing order of November 10, 1969.[1] Such motion lacks merit.

---

\* But *see* local Rule 11(g) for the impropriety of such a handling.

1. " * * * [I]t is ORDERED that hereafter no attorney, or his representative, shall approach, or cause to be approached, a juror in an effort to find out what went on among the jurors in the jury room in arriving at a verdict, without permission of the presiding judge." Standing order of November 10, 1969.

" * * * The general rule is that jurors may not impeach their verdict, but the rule does not preclude inquiry into any extraneous influences brought to bear upon the jury in order to show what the influences were and whether they were prejudicial. * * *" *Womble v. J. C. Penney Company,* C.A. 6th (1970), 431 F.2d 985, 987[10] (citation omitted). Accordingly, where suspicious circumstances are brought to the attention of the Court suggesting a reasonable possibility that an extraneous influence might have been brought to bear on one or more jurors, or suggesting other jury misconduct, the Court will conduct an evidentiary hearing thereon. *See e.g. Lamb v. Jones Wholesale Co., Inc.,* D.C. Tenn. (1978), 454 F.Supp. 129.

This Court will not interrogate jurors, nor will it permit counsel to do so, upon the mere assertions of counsel; there must be a showing, by affidavit or otherwise, of *facts* from which a reasonable suspicion arises. The unsworn assertions of counsel herein [2] are insufficient to justify an interrogation of the jurors.

The desire for such an interrogation appears to be little more than " * * * what is commonly known as a *fishing expedition* in an effort to find material with which to impeach the verdict by the testimony of a juror. * * *" *Stephens v. City of Dayton, Tennessee,* C.A. 6th (1973), 474 F.2d 997, 998. Under these circumstances, it would be an abuse of discretion for the Court to authorize counsel to interrogate the jurors herein. *Ibid.,* 474 F.2d at 999[2].

The motion of the defendants hereby is

DENIED.

### ORDER ON ATTORNEYS FEES

The encouragement of counsel herein by the Court to take *ex parte* steps to agree upon the fair market-value of the services rendered by their attorney to the plaintiffs herein, *see* memoranda opinions and orders herein of July 6, 1981, having been of no

2. *See* local Rule 12(a): "Counsel shall submit with all written motions * * * where allegations of fact are relied upon, affidavits in support thereof."

more avail (evidently) than if never suggested, the Court must be burdened, unnecessarily, it is believed, with receiving evidence of facts requisite to make a finding as to the amount of the fair market-value of such services. It is disappointing that such attorneys, each of whom is an officer of this Court and theoretically obliged to assist it in the proper administration of justice, has apparently not taken the first step, or any step, to aid the Court in this regard: and each of them hereby is REPRIMANDED for any such failure.

The clerk will assign this action for further trial and finding as to the aforementioned fair market-value of the services to them, and compensable expenses, of the plaintiffs' attorney as no. 6 on the Court's calendar for Wednesday, September 9, 1981. (Counsel are put on notice that if such further trial is not reached and concluded on the presently-overburdened calendar of that day by 4:30 o'clock, p. m., Wednesday, September 16, 1981, further proceedings may be expected to be conducted in Greeneville, Tennessee.)

### ON ATTORNEYS FEES AND COSTS

The Court reserved the determination of the amount which should be taxed against the defendants as a part of the costs of the plaintiffs as their (the plaintiffs') reasonable attorney fee. *See* memoranda opinions and orders herein of July 6, 1981 and Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988. In making that determination, the Court looks to the fair market-value of the services provided the plaintiffs by their counsel. *Northcross v. Board of Ed. of Memphis City Schools,* C.A. 6th (1979), 611 F.2d 624, 638[29].

Such services fell into two categories: such counsel spent 13 hours in trial and 171.9 additional hours outside of court in the current representation. He claims in addition the expenditure of $3,398.83 * in

* The aggregate claim therefor is listed at $2,916.33; however, a further amount of $482.50 for additional expense of a deposition-reporter is in dispute between such reporter

reimbursable expenses as the aggregate of the amounts he advanced therefor.

It is stipulated by all remaining parties that, if called, one witness offered by the plaintiffs would testify that the fair market-value of the services rendered the plaintiffs herein was between $150 and $200-per hour with a percentage-multiplier to be added for the contingency of the fee to be paid plaintiffs' counsel and the exceptionalness and undesirability of the representation he undertook herein. Another witness for the plaintiffs, offered under the same stipulation, would testify that such fair market-value was between $125 and $200-per hour with a percentage-multiplier of from 25% to 33⅓% for such contingency and the unusualness and undesirability of the representation involved.

■ " * * * The contingency factor * * is part of the reasonable compensation to which a prevailing party's attorney is entitled under [42 U.S.C.] § 1988." *Ibid.*, 611 F.2d at 638 (*cf.* esp. discussion under [33]). Also: " * * * Adjustments upward may be made to reflect * * * the 'undesirability' of the case. * * * " *Ibid.*, 611 F.2d at 643.

It is represented to the Court by respective defense counsel, as officers thereof, that counsel for the plaintiffs accepted employment herein on the basis of a fee to be calculated on the amount of the plaintiffs' recovery. This Court is not aware that plaintiffs' counsel has exhibited any such agreement herein.

■ A contract calling for an attorney's fee determinable by the amount of recovery is recognizable. *Jeffries v. Mut. Life Ins. Co.* (1884), 110 U.S. 305, 4 S.Ct. 8, 28 L.Ed. 156. " * * * Nevertheless, the right to contract for a contingent fee has never been thought to be unrestrained. * * * [C]ourts have refused to enforce contingent fee arrangements when the amount of the fee seemed excessive. * * * " *Cappel v. Adams*, C.A. 5th (1970), 434 F.2d 1278, 1280[4]. Such contracts are especially subject to re-

striction when the clients are under some disability in the law. *Idem.*

■ " * * * It is well recognized that the court has the power to set fees in cases involving persons of presumed incapacity to look after their affairs intelligently. * * * " *Schlesinger v. Teitelbaum*, C.A.3d (1973), 475 F.2d 137, 139[1]. The plaintiff Mr. Green was so lacking in capacity (after having suffered a stroke) that he could make no intelligible answers to the most routine sort of questions propounded to him, and his wife appeared limited to a lesser degree, during the trial herein. Therefore, the Court will determine the appropriate amount of reasonable attorney's fee for the plaintiffs' attorney.

■ The Court FINDS from the evidence and the entire record that a reasonable fee for the services to the plaintiffs of their counsel herein is:

—$325-per-hour for the 13 hours of trial-time;

—$162.50-per-hour for the 171.9 hours of nontrial-time; and,

—$5,000 additional fee for the

contingency of the fee and the "undesirability"-aspects of the action. Mathematically, those aggregate amounts are, respectively, $4,225 for trial-time; $27,933.75 for nontrial-time; and $5,000 as an upward adjustment; or an aggregate fee for professional services of $37,158.75.

42 U.S.C. § 1988, *supra*, also authorizes the reimbursement of incidental and necessary expenses incurred in furnishing effective and competent representation, and 28 U.S.C. § 1920 authorizes the payment as costs of the out-of-pocket expenses incurred by the attorney for the prevailing party which costs were paid to a third-party and are normally charged to a fee-paying client in the course of providing legal services. *Northcross v. Board of Ed. of Memphis City Schools, supra*, 611 F.2d at 639–640[38]. The Court FINDS further that the attorney

and counsel. An item of $494.55 paid to "Jane Duke" for an unspecified purpose on March 6, 1980 is not yet substantiated properly as a

reasonable and necessary expense of such counsel herein.

for the plaintiffs is entitled to reimbursement of $2,421.78 for necessary expenses and out-of-pocket expenses on the present record, in addition to the aforementioned fee. Upon further development of the record, such attorney may also be entitled, upon the taxing by the clerk of the costs herein, to reimbursement of all or some part of additional expenses of $977.05. The clerk will tax such fee and reimbursable expenses in accordance with the tenor of this opinion and order.

The plaintiffs sought to discover of adversary counsel certain items and information relating to the fees charged the defendants by their respective counsel. That issue is now MOOT and such motions for discovery hereby are STRICKEN.

The respective amounts charged by defense counsel herein only had relevance to the Court's suggestion of July 6, 1981 by which all counsel herein were encouraged by the Court to take *ex parte* steps as were deemed advisable to agree among themselves upon the amount of the fair market-value herein of the services of their counsel to the plaintiffs. Counsel were unable to so agree, and the procedure, suggested under different circumstances, is no longer a viable consideration.

## ON MOTION FOR JUDGMENT NOV

The defendants Messrs. David L. Francis, Harold Smith, Thomas Upchurch, Thomas C. Matthews, John T. Underwood and Herbert Cunningham moved timely for a judgment notwithstanding the verdict herein or, alternatively, for a new trial. Rules 50(b), 59(a), (b), Federal Rules of Civil Procedure. The motion lacks merit in each of its alternatives.

■ " * * * When reasonable minds can reach different conclusions, the issue[s] of fact must be submitted to the jury. * * * " *Chandler v. Edgar W. Long, Inc.*, C.A. 6th (1980), 623 F.2d 1139, 1142[2]. Once the jury resolves these issues: " * * * Judgment notwithstanding the verdict is not proper unless the evidence is such that there can be but one reasonable conclusion as to the proper verdict. It should not be granted if there is a conflict in the evidence, and credibility of [the] evidence is not to be considered in passing on a motion for judgment. * * * " *Reeves v. Power Tools, Inc.*, C.A. 6th (1973), 474 F.2d 375, 380[8].

■ Simply stated, the issue presented by a motion for judgment notwithstanding the verdict is whether there was sufficient evidence to raise a question for the jury. *Warkentien v. Vondracek*, C.A. 6th (1980), 633 F.2d 1, 6. " * * * Where a conflict in the evidence has been resolved by the jury's verdict, and there is an evidentiary basis for that verdict, it would be error for the Court to reevaluate the conflicting evidence and mandate a result opposite from that reached by the jury by granting a new trial. * * * " *Independent Const. Co. v. Mathis*, D.C.Tenn. (1978), 79 F.R.D. 18, 20[3], citing *Basham v. Pennsylvania Railroad Company* (1963), 372 U.S. 699, 700–701, 83 S.Ct. 965, 966–977[2], 10 L.Ed.2d 80.

■ This Court remains of the opinion that there was ample evidence to raise issues of fact herein for resolution by the jury, and that there was sufficient evidence to support the verdicts rendered by the jury. Neither is the Court convinced that it committed an error which affected the substantial rights of the parties. *See* Rule 61, Federal Rules of Civil Procedure. In each of its alternatives, the motion hereby is

OVERRULED.

## ON STRIKING "SATISFACTION OF JUDGMENT"

Judgment was entered herein on October 20, 1981, *inter alia*, awarding the plaintiffs damages aggregating $63,000 against the defendants Messrs. David Williams, Roy Fann, Randall Boyce, David L. Francis, Harold Smith, Thomas Upchurch, Thomas C. Matthews, John T. Underwood and Herbert Cunningham.* The first three of the afore-

---

* Such judgment also stated that costs, which included a reasonable attorney's fee, would be taxed in accordance with the Court's memoran-

named defendants filed unilaterally on February 22, 1982 a document entitled "Satisfaction of Judgment" which recites that they have paid to the plaintiffs the sum of $22,500 and which appears to give the impression that such payment satisfies the judgment as to them.

The plaintiffs moved the Court to strike such "Satisfaction of Judgment." "The satisfaction of a judgment refers to compliance with or fulfilment of the mandate thereof. Ordinarily it means payment of the money due thereunder. * * * " 47 Am.Jur.2d 80, Judgments § 979.

■■■■ Obviously, the payment to the plaintiffs, and the receipt by them, of an amount less than the amount called-for by the judgment herein is not a satisfaction thereof. *See Ballard v. Ballard* (1970), 224 Tenn. 390, 455 S.W.2d 592, 594[4]. While the plaintiffs might agree to accept less than the amount of the judgment in full satisfaction thereof and release the payors from any further liability thereunder, their acceptance of such partial payment does not, standing alone, amount to an accord and satisfaction of the judgment. *See United States v. Hougham* (1960), 364 U.S. 310, 312, 81 S.Ct. 13, 16, 5 L.Ed.2d 8, 12 (headnote 1), rehearing denied (1961), 364 U.S. 938, 81 S.Ct. 376, 5 L.Ed.2d 372.

To the extent the "Satisfaction of Judgment" herein of February 22, 1982 purports to imply that such judgment has been satisfied, same hereby is

STRICKEN.

dum opinion and order herein of October 19, 1981.